Steven ANDRE, Plaintiff,

v.

SALEM TECHNICAL SERVICES,
a corporation, and Stepan
Company, Defendants.

No. 91 C 5462.

United States District Court,
N.D. Illinois, E.D.

July 9, 1992.

Mark D. DeBofsky, DeBofsky & DeBofsky, Chicago, Ill., for plaintiff.

Steven C. Kyriazes, Downers Grove, Ill., for Salem Technical Services.

James W. Gladden, Jr., Terri A. Mazur, Jennifer T. Ansbro, Mayer, Brown & Platt, Chicago, Ill., for Stepan Co.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Steven Andre ("Andre") suffered a heart attack just after leaving a job at Stepan Company ("Stepan") for a new job at Salem Technical Services ("Salem"). Both companies denied insurance coverage for that misfortune: Salem because Andre was not yet officially enrolled in its health plan, and Stepan because Andre's coverage under its plan had lapsed. Andre claims that the Employee Retirement Income Security Act ("ERISA," 29 U.S.C. §§ 1001–1145 [1]) requires one company or the other to provide him with retroactive coverage.

All three parties have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56.[2] For the reasons stated in this memorandum opinion and order, Andre's and Stepan's motions are denied, while Salem's is granted. This action will continue only as between Andre and Stepan.

---

[1] Further citations to ERISA will take the form "Section—," referring to Title 29's numbering and not to ERISA's internal section numbers.

[2] Each party has also filed his or its factual statement required for every Rule 56 motion by this District Court's General Rule 12(m) or (n).

Andre's initial statement is cited as "Andre 12(m)", and defendants' statements are cited as "Salem 12(n)," and "Stepan 12(n)" (both in response to the Andre 12(m) statement) and "Salem Supp. 12(m)" and "Stepan 12(m)" (in support of their respective Rule 56 motions).

## Facts

Andre worked for Stepan and received health insurance through the company's plan (Andre 12(m) ¶ 4). In late 1990 he accepted a new job with Salem to begin on January 2, 1991 (*id.* ¶ 6). Salem is a contract agency that places technical personnel with other companies on a temporary basis, and Andre's contract specified that he would be assigned to B.F. Goodrich Chemical Company (*id.*).

Andre left Stepan's employ on December 28, 1990 (*id.* ¶ 5). Before starting his new job at Salem, Andre went through the paperwork routines that typically accompany such a transition. Three documents from the transition period bear on the case:

1. Andre's employment contract with Salem stated (*id.* ¶ 12):

> Hospitalization and life insurance is available for $22.97 per week. FBE and dependency coverage will cost $68.30 per week. Effective on 2/02/91.

2. Salem provided Andre with a form headed "Prudential Insurance Request" (the "Request Form"). Just beneath that heading these words appeared:

> IF YOU WISH TO PARTICIPATE IN THE INSURANCE PROGRAM, PLEASE FILL OUT THE INFORMATION BELOW AND AN INSURANCE PACKAGE WILL BE FORWARDED TO YOU.

Andre signed his name in the space just below that directive and returned the document to Salem. Relatedly, he left blank another portion of the form where he could have indicated his intention not to join the insurance program (*id.* ¶¶ 9–10).

3. Salem also provided Andre with a brochure prepared by its corporate parent, The SEC Companies, entitled "Your Flexible Benefit Program." That brochure read in relevant part (*id.* ¶ 14, emphasis added):

Among the benefits offered by The SEC Companies are the Basic Life Plan and the Medical Plan.

\* \* \* \* \* \*

Similarly, all new employees who become eligible to participate (eligibility is determined by the individual Basic Life Plan and Medical Plans themselves) after September 1, 1986 will *automatically be enrolled* in the Flexible Benefit Plan on the date they become eligible unless they reject coverage.

\* \* \* \* \* \*

You are automatically enrolled in the Plan when you first become eligible for coverage under the above Benefit plans. If you do not want to participate in the Plan, you will have to reject coverage by completing a rejection of coverage form.

As for Stepan, every employer subject to ERISA must make post-employment health insurance available to its departing employees for up to one year after termination (see Sections 1161–1167, popularly known as "COBRA"[3]). Stepan offered such continuing coverage to Andre. On January 14, 1991 Andre returned a form electing that coverage (Andre 12(m) ¶ 44).

Andre's election guaranteed him 30 days of insurance coverage, retroactive to his December 28 departure date. After that 30-day period Andre could maintain the coverage through Stepan by making monthly premium payments. Andre paid for coverage through January 31 (*id.* ¶¶ 45–46), but he made no payment for February because he thought his coverage with Salem would begin automatically on February 2 (*id.* ¶ 34). At least in Stepan's view, then, his COBRA coverage automatically lapsed on February 1.

Andre went to work for Salem and at B.F. Goodrich as scheduled. From February 17 to February 24, 1991 he took a week's bereavement leave to attend his mother's funeral in New Jersey and deal with related family business (*id.* ¶¶ 30–31).

---

**3.** This is a spiffy acronym for the otherwise drab Comprehensive Omnibus Budget Reconciliation Act of 1986, which contained the cited amendments to ERISA.

On February 26, 1991 Andre suffered a myocardial infarction. He spent the next six days in two different hospitals, undergoing balloon angioplasty surgery at the second. At the time of the hospitalizations Andre believed that he was covered by Salem's health plan (*id.* ¶ 33–34). When asked at the hospital how his expenses would be covered, Andre replied, "Through my employer, Salem" (Stepan 12(m) ¶ 6). But he learned otherwise the day after his discharge from the hospital. On that date first Salem and then Stepan refused health insurance coverage.

Salem conceded that Andre had completed the Request Form, but it said that he had failed to return another form necessary for his actual enrollment in the company's plan (the "Enrollment Form"). Salem has offered sworn testimony that the Enrollment Form was mailed to Andre as part of the "insurance package" referred to in the Request Form (Salem Supp. 12(m) ¶ 11). Andre swears that he never received the package (Andre 12(m) ¶ 17).[4] Because Salem believed that it had made no error, it refused to enroll Andre retroactively—a step that it had taken in two earlier cases of administrative error involving other employees (*id.* ¶¶ 23, 25).

Andre then turned to Stepan to see if it were possible to reinstate his COBRA coverage. But Stepan maintained that the coverage had lapsed automatically when he failed to make the premium payment for February on the first of that month, as the policy required (Complaint Ex. A). Consistent with company policy, Stepan had not sent Andre any sort of notice before allowing his coverage to lapse: no monthly bill, no warning of cancellation.

COBRA permits reinstatement of coverage if the former employee pays the monthly premium within 30 days of the due date (Section 1162(2)(C)). But Andre did not inquire about reinstating his coverage until March 4 at the earliest—that would have been the day after his discharge from the hospital on Sunday, March 3 and the 31st calendar day after his February payment came due (Andre 12(m) ¶ 60). There is some dispute about just when Andre made his inquiry, about which more later. It is undisputed that Stepan promised to look into the matter and call Andre back. When it did not, Andre tendered a check for the premium on March 12. Stepan refused to reenroll Andre and returned his check 10 days later, and within a few days it again refused to accept premium payments that Andre then retendered (*id.* ¶¶ 61–64).

Andre finished his assignment at B.F. Goodrich on April 19. He has been unemployed ever since (*id.* ¶ 35). Stepan's refusal to renew COBRA coverage left Andre where he is today: in debt to his medical providers for more than $16,342.72 (*id.* ¶ 36), with no health insurance whatever to reduce his personal liability for that sum. Andre then commenced this lawsuit.

### *Does Andre Have ERISA Standing?*

Salem denies that Andre is entitled to sue it, much less recover, under ERISA (its Mem. 6–7).[5] Section 1132(a)(1)(B) permits a "participant or beneficiary" to recover benefits due under a plan. Andre claims to be a "participant" as that term is defined by Section 1002(7):

> The term "participant" means any employee or former employee of an employer ... who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer....

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117–18, 109 S.Ct. 948, 957–58, 103 L.Ed.2d 80 (1989) (citations omitted) expands upon that statutory definition:

> In our view, the term "participant" is naturally read to mean either "employees in, or reasonably expected to be in, currently covered employment," or former employees who "have ... a reasonable expectation of returning to covered em-

---

4. As will be made clear, the nature of Andre's legal theory against Salem makes it unnecessary to resolve that evidentiary dispute.

5. Although Stepan did not advance the same argument, if successful it would prove fatal to an ERISA claim against Stepan as well.

ployment" or who have "a colorable claim" to vested benefits. In order to establish that he or she "may become eligible" for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future. "This view attributes conventional meanings to the statutory language since all employees in covered employment and former employees with a colorable claim to vested benefits 'may become eligible.' A former employee who has neither a reasonable expectation of returning to covered employment nor a colorable claim to vested benefits, however, simply does not fit within the [phrase] 'may become eligible.' "

Because Andre no longer works for Salem, he does not fall within the statutory provision for suits by current "employees." Nor does he claim to have any expectation, reasonable or otherwise, of returning to work for the company. That leaves him only with the possibility that he is a "former employee ... with a colorable claim to vested benefits" (*id.*). Though the first part is easy—Andre is obviously a "former employee"—whether he states a "colorable" claim to "vested" benefits poses not one but two somewhat more difficult questions.

### 1. *"Colorable" Claim*

Whether Andre's claim is "colorable" in the *Firestone* sense is a question that is quickly answered. By imposing that requirement *Firestone* made it clear that a plaintiff cannot become a "participant" under ERISA merely by filing an ERISA lawsuit. Some threshold analysis of the merits is necessary to prevent such bootstrap jurisdiction. But *Kennedy v. Connecticut Gen. Life Ins. Co.*, 924 F.2d 698, 700 (7th Cir.1991) (citation omitted, emphasis added) teaches that the threshold inquiry is not very demanding:

> But as *Firestone* held, subject-matter jurisdiction depends on an *arguable*

claim, not on success. Only if [the claim] must be frivolous is jurisdiction lacking.

All that this Court need do at this stage, then, is to determine that Andre's case has some potential merit.

 Andre passes that test easily as to both Salem and Stepan. To be "colorable" a claim need not be established beyond all doubt, or even beyond most doubt, on the face of the pleadings. Andre's legal theories are somewhat novel,[6] but they are not *so* novel—that is, not so bizarre or so out of line with existing precedent—that he necessarily stumbles over the low threshold of the "colorable" requirement. Certainly his theories are rooted in existing ERISA law, and he alleges facts sufficient to support those theories. Thus his claim is "colorable" under *Firestone*.

### 2. *"Vested" Benefits*

As to whether Andre's "colorable" claim is one seeking recovery of a "vested" benefit, that is ordinarily defined as a right that is (*Rhee v. Witco Corp.*, 762 F.Supp. 211, 214 (N.D.Ill.1991), quoting Black's Law Dictionary 1401 (5th ed. 1979)):

> Fixed, accrued, settled, absolute. Having the character or given the rights of absolute ownership; not contingent.... To be "vested," a right must be more than a mere expectation based on an anticipation of the continuance of an existing law.... Said of pension plan benefits that are not contingent on the employee continuing to work for the employer.

For example, pension benefits vest as a matter of law under ERISA. Any employee who works the required number of years and contributes the required amount to a pension fund becomes entitled to a fixed and irrevocable benefit on the date of his or her eligibility.

Welfare benefit plans, in contrast, do remain subject to change or renegotiation unless the parties agree otherwise (*Senn v. United Dominion Industries, Inc.*, 951 F.2d 806, 814 (7th Cir.1992)). Without such

---

**6.** For example, Andre cites no ERISA cases that squarely impose on an employer the fiduciary duties of an agent for employees who wish to obtain insurance from the company. Nor does he cite any cases that require employers to give notice of termination under COBRA.

an agreement an employee has no fixed entitlement to any welfare benefits at all, much less to a particular form of health insurance.

If by "vested benefits" *Firestone* meant to embrace only "pension benefits," then no former employee could bring an ERISA claim for welfare benefits allegedly accrued during employment. This Court's colleague Honorable James Zagel has stated just that position (no "vested benefits" *because* the plan at issue was a welfare benefit plan, not a pension plan) in summary fashion (*Gardner v. Container Corp. of America*, No. 88 C 1824, 1990 WL 186437, at *1, 1990 U.S. Dist. LEXIS 15467, at *2–3 (N.D.Ill. Nov. 15, 1990)). It should be noted that such a view, which bars a former employee from "participant" status, does not necessarily leave him or her without recourse. Ordinarily ERISA preempts any state-law claims involving pension or welfare benefits protected by ERISA (*Smith v. Blue Cross & Blue Shield United*, 959 F.2d 655, 657 (7th Cir.1992)). But if the employee lacks ERISA standing, then ERISA preemption might not operate and a contract action could perhaps proceed.[7]

In any event, more recently the Eleventh Circuit has taken a more expansive (and more tenable) view of ERISA standing. *Willett v. Blue Cross & Blue Shield*, 953 F.2d 1335, 1342–43 (11th Cir.1992) holds that a former employee may sue under ERISA to recover health benefits that the employer should have provided under the stated terms of its own plan—even though the employee has no expectation of returning to work for that employer. To this Court, *Willett* states the better rule than does Judge Zagel's one-sentence contrary opinion.

■ Current employees may recover under ERISA when the employer or the insurer refuses to reimburse already-incurred medical expenses that rightly should have been covered under the employer's plan (*Brundage–Peterson v. Compcare Health Serv. Ins. Corp.*, 877 F.2d 509 (7th Cir. 1989)). That principle applies even if (as is most often the case) the health benefits are not "vested," using that word in the sense of an irrevocable commitment to continue such benefits in the future. All that matters is that the employer has promised to provide certain benefits for a certain period of time. So long as that promise remains in effect, any current breach will trigger liability for "benefits due" under Section 1132(a)(1)(B).

■ There is no reason why the termination of the employment relationship should erase that liability and shift the legal playing field from ERISA to contract. By definition any "benefits due" must have accrued during the employment relationship, at a time when the employer's conduct was subject to the strict fiduciary duties of ERISA. Those duties undoubtedly cease to exist when the employment relationship ceases to exist. But the rights and liabilities that have been created *during* the relationship remain the same—in the language of the statute, any already-accrued "benefits" remain "due."[8] Welfare benefits can accrue and hence "vest" in that somewhat different (but equally conventional) sense even if the terms of the welfare plan may change drastically in the future.

So no principle requires that the word "vested" should be given a narrow meaning in *Firestone*'s reference to "vested benefits." It makes more sense to treat "vest-

7. Lest it be thought that the text statement is unduly hedged, the reader is referred to the sharply divided views emanating from the ultimate authority—the United States Supreme Court—in *Gade v. National Solid Wastes Management Ass'n*, —— U.S. ——, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992), leaving the lines between express preemption, implied field preemption and implied conflict preemption extraordinarily blurred. Fortunately this Court is not called upon to take on the problem here.

8. To cite but two examples of the injustice that might flow from the opposite conclusion:

 1. Any employer could terminate ERISA liability simply by firing an employee who was making noises about a claimed denial of benefits.

 2. Any former employee who had become too sick to remain on the payroll would lack standing to recover past-due health benefits under ERISA.

ed" as shorthand for "fixed in time during the employment relationship." Only then is the word accorded a meaning coextensive with the scope and purpose of the statute. Like the plaintiffs in *Willett* and *Brundage–Peterson*, Andre alleges that he was denied benefits that were owed to him under the plain terms of the health plan in place at the relevant time. Therefore he has stated a claim for "vested benefits" in *Firestone* terms.

Indeed, there is an even more direct route that leads to the same destination. It will be recalled that *Firestone* was construing the branch of the "participant" definition that speaks of a former employee who *"may* become eligible to receive a benefit"—a concept that, because it inherently involves the element of futurity, forced *Firestone*'s inquiry into the related concept of "vested" benefits. But a statutory "participant" also includes a former employee who *"is* ... eligible to receive a benefit." And if Andre is right in what he claims (something that must be assumed in deciding the current question of whether he has standing to sue under ERISA), he surely *is* eligible to receive the benefit for which he sues. And so it follows once again that a benefit that became due during the employment relationship continues to qualify the claimant as a "participant" still able to sue after the employment terminates.

### 3. *Conclusion*

This is not a case in which any of the sometimes arbitrary rules of construction (or other arbitrary rules of law) bend ordinary English into unrecognizable shapes. Andre is indeed an ERISA "participant" entitled to sue under that statute.

### Standard of Review

■ Before this opinion turns to the merits of Andre's claims, though, it is necessary to decide the appropriate standard of review as to the claim against each company. Courts ordinarily assess a trustee's denial of benefits under a de novo standard, while an "arbitrary and capricious" standard applies if the plan gives the trustee the discretion to construe its terms (*Petrilli v. Drechsel*, 910 F.2d 1441, 1445 (7th Cir.1990)).

Salem does not point to any reservation of discretion in its plan documents. Instead it argues that its denial was not based upon plan interpretation and that the deferential "arbitrary and capricious" standard applies to such denials—a theory that *Petrilli, id.* at 1447 specifically declined to endorse or reject.

It is unnecessary to resolve the validity of that theory here either. Under *Petrilli* a denial is based upon plan interpretation if the court's job is to decide whether the trustee correctly applied the plan language to the undisputed facts (*id.* at 1448). That description captures the situation here, where the only question is whether on the already-described facts Andre must be deemed "enrolled" within the meaning of Salem's plan. De novo review is in order.

Stepan makes no argument about the standard of review. As to it too, however, the issue is whether on the undisputed facts the company has denied Andre a legal entitlement. De novo review is proper as to Stepan as well.

### Andre's Substantive Claims [9]

This opinion now turns to an analysis of the merits. Andre raises distinct argu-

---

**9.** Rule 56 requires a ruling in favor of the moving party if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." For that purpose an issue is "genuine" when the evidence would permit a reasonable factfinder to adopt the view of the nonmovant (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Old Republic Ins. Co. v. Federal Crop Ins. Corp.,* 947 F.2d 269, 274 (7th Cir.1991)), and a fact is "material" if it would prove outcome-determinative under the substantive law (*Pritchard v. Rainfair, Inc.,* 945 F.2d 185, 191 (7th Cir.1991)). Naturally the burden is on the movant to establish the lack of any genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2551–53, 91 L.Ed.2d 265 (1986)). In deciding whether that burden has been met, the court must draw "all reasonable inferences in favor of the nonmoving party" (*Allensworth v. General Motors Corp.,* 945 F.2d 174, 178 (7th Cir.1991)). On cross-motions, then, the court must extend the required inferences to each party when con-

ments against each defendant, and the potential liability of each is considered in turn.

## Salem

### 1. Agency Theory

As a matter of state insurance law, an employer generally becomes its employees' agent for purposes of obtaining group health insurance (*Sur v. Glidden–Durkee, Div. of S.C.M. Corp.*, 681 F.2d 490, 493 (7th Cir.1982) (applying Indiana law); *Roberts v. Board of Education*, 134 Ill.App.3d 303, 306, 89 Ill.Dec. 257, 260, 480 N.E.2d 143, 146 (4th Dist.1985)). And every broker or other agent must act with due diligence "to place the insurance in compliance with the principal's instructions" or else face liability for breach of fiduciary duty (*Lake County Grading Co. v. Great Lakes Agency, Inc.*, 226 Ill.App.3d 697, 703, 168 Ill.Dec. 728, 732, 589 N.E.2d 1128, 1132 (2d Dist.1992)). Damages for breach of that duty ordinarily equal the value of the benefits that the desired policy would have provided (*id.* at 701, 168 Ill. Dec. at 731, 589 N.E.2d at 1131).

Andre maintains that his submission of the Request Form turned Salem into Andre's agent for purposes of obtaining insurance (Andre Mem. 9):

> If the enrollment form was necessary, once it became clear that Andre had not received and returned the [Request F]orm, despite Andre's affirmative expression of interest in participating in the plan by returning the "Prudential Insurance Request", as Andre's fiduciary, Salem should have made every effort to enroll him in the plan; and when its failure to timely enroll Andre became known, Salem was under a duty to retroactively enroll him.

Under that legal theory it becomes unnecessary to resolve the evidentiary conflict about the second set of forms. On Salem's motion this Court must grant the pro-Andre inference that the forms were

not really mailed, or that some error on the company's part (perhaps an incorrect address or inadequate postage) prevented delivery. On Andre's motion the court must grant the pro-Salem inference that the forms were in fact mailed.[10] But either way Salem loses, for its alleged duty would have matured when it did not receive the Enrollment Form on time. It does not matter who was responsible for the failure.

As already indicated, any such agency relationship (if one existed) was a creature of state law. That demands an extension of the state-law agency doctrine, under which Andre asks this Court to hold that the same legal principles apply under the federal common law of ERISA. Doctrinal transplants from state to federal law are routine in many substantive areas, of course, and ERISA is no exception (see, e.g., *Nationwide Mut. Ins. Co. v. Darden*, —— U.S. ——, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992) (common law of agency used to give content to the statutory definition of "employee"); *Firestone*, 489 U.S. at 110–11, 109 S.Ct. at 953–54 (principles of trust law used to determine standard of review under Section 1132(a)(1)(B)); *Phillips v. Lincoln Nat'l Life Ins. Co.*, 774 F.Supp. 495, 498 (N.D.Ill.1991) (recommending liberal borrowing from state insurance law)).

Such a transplant can occur, though, only when the patient is certain not to reject it—that is, when the principles of state law comport with the policies of the ERISA statute and case law. Assume (without deciding, see n. 11) that Salem became an ERISA fiduciary with duties parallel to those of an agent in state insurance law. Even on that assumption the prevailing ERISA law would limit the scope of the agency in a way that frees Salem from any potential liability.

*Pohl v. National Benefits Consultants, Inc.*, 956 F.2d 126, 128–29 (7th Cir.1992) (citations omitted) teaches:

---

sidering the other's motion, a process that sometimes compels the denial of both motions. That happens here as between Andre and Stepan.

**10.** No direct evidence indicates that Andre received the forms but failed to complete them, although Salem might reasonably ask a jury to draw that inference.

A fiduciary is an agent who is required to treat his principal with utmost loyalty and care—treat him, indeed, as if the principal were himself. The reason for the duty is clearest when the agent has a broad discretion the exercise of which the principal cannot feasibly supervise, so that the principal is at the agent's mercy. The agent might be the lawyer, and the principal his client; or the agent might be an investment adviser, and the principal an orphaned child. If the agent has no discretion and the principal has a normal capacity for self-protection, ordinary contract principles should generally suffice.

Thus the employer's duty of due diligence under ERISA is greatest when the employer assumes the responsibility for things that only the employer can do. That category would include such tasks as the initial selection of a third-party insurer to provide employees with group coverage, or the ministerial jobs (such as the forwarding of premium payments withheld from employees' paychecks) that are necessary to keep the group plan viable for individuals who choose to participate.

But an individual employee's attempt to enroll in a welfare benefit plan presents a different situation, one where typically "the agent has no discretion and the principal has a normal capacity for self-protection" (*id.*). Here Salem had no discretion—only the ministerial responsibility of doing the paperwork necessary to get Andre enrolled with Prudential.[11] And as for Andre, he had numerous means of self-protection available to him. It is undisputed that if he had attempted to confirm his enrollment in the plan, whether by phone call, letter, personal visit or some other means, Salem could and would have corrected the initial problem and gotten him enrolled. He did none of those things until after his heart attack, although a number of red flags had gone up before that time: No insurance deductions were taken from his paycheck, the promised "insurance package" never arrived and he never received an insurance card of the type that large insurers typically issue.

*Pohl* teaches in effect that the employee too has a type of due-diligence responsibility—a duty to exercise the available means of self-protection. Andre did not satisfy that duty.

### 2. Equitable Estoppel

Andre also seeks to recover on an equitable estoppel theory, as articulated in *Black v. TIC Invest. Corp.*, 900 F.2d 112, 115 (7th Cir.1990):

> There is no reason for the employee who reasonably relied to his detriment on his employer's false representations to suffer. There is no reason for the employer who misled its employee to be allowed to profit from the misrepresentation.

When the facts are undisputed, as they are here, the question of estoppel becomes one of law for the court (*Jennings Water, Inc. v. City of North Vernon*, 895 F.2d 311, 316 (7th Cir.1989)).

Under *Black*, 900 F.2d at 115 an employee may bring an estoppel claim to recover benefits from an unfunded single-employer welfare benefit plan under ERISA. Salem offered Andre coverage through a plan that served Salem and other employers owned by the same parent, The SEC Companies. This opinion assumes that such common parentage among the members of the plan is enough to make it a single-employer plan for present purposes.

Salem's own documents allegedly gave Andre the reasonable impression that his health insurance would take effect automatically one month after he started work. But for his reliance on that impression, Andre presumably would have taken more

---

**11.** *Pohl*, 956 F.2d at 129 even calls into question whether under the circumstances Salem had *any* fiduciary obligation to Andre:

> At all events, ERISA makes the existence of discretion a sine qua non of fiduciary duty. Although Salem's role was essentially ministerial, it did retain—and refused to exercise—the

discretion to enroll employees retroactively in the event of administrative error. To avoid the possibility of a one-way result, however, this opinion will assume that a fiduciary relationship existed—for analysis shows that any such assumed relationship would not impose the obligations that Andre says it did.

initiative to ensure that he became enrolled.[12]

Under *Black, id.* "[a]n estoppel arises when one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation." Andre argues that Salem made the necessary "misleading representation" through the employment contract, the "Flexible Benefits" brochure and the Request Form. Yet neither a document-by-document review nor a look at the three documents as a whole supports the proposition that Salem made a misleading representation. Each of those approaches, of course, must begin with the document-by-document review.

First, Andre's employment contract designated him a Full Benefit Employee ("FBE") and stipulated (Complaint Ex. B):

> Hospitalization and life insurance is available for $22.97 per week. FBE and dependency coverage will cost $68.30 per week. Effective on 2/02/91.

Note that the contract said only that coverage would become "available," not "operative," effective February 2, 1991. Furthermore, the contract distinguished between individual coverage and individual-plus-dependents coverage, with the latter costing three times more than the former. Obviously an insurer could not arbitrarily assign an employee to one sort of coverage or the other without direct input from the employee.

Second, the brochure entitled "Your Flexible Benefits Program" included this language under the heading "Introduction" (Complaint Ex. D, emphasis added):

> Similarly, all new employees who become eligible to participate (*eligibility is determined by the individual Basic Life Plan and Medical Plans themselves*) will automatically be enrolled in the Flexible Benefit Plan on the date they become eligible unless they reject coverage.

Virtually identical language also appeared in the same document under the heading "Enrollment."

Andre emphasizes the brochure's promise of "automatic[ ]" enrollment. But the brochure specified that automatic enrollment occurred only "when you first become eligible for coverage...." Eligibility was in turn "determined by the individual Basic Life Plan and Medical Plans themselves...." It strains credulity to read that language as an unconditional promise of automatic enrollment on February 2. Just the opposite is true: That promise was specifically conditioned upon meeting eligibility criteria that were not spelled out in the brochure itself.

Third, Andre could indicate on the Request Form either that he wanted health insurance or that he rejected it. When he wrote (as he did) that he wanted it, he knew that an "insurance package" was then supposed to be sent to him. Under the established procedures that package, if sent, would include the Enrollment Form. But the Request Form did not specify what was in the package, so on his version of events Andre never learned of the Enrollment Form's existence.

But what controls on the issue of misrepresentation is that the Request Form made no promises of enrollment, conditional or otherwise. It merely promised a follow-up package of insurance information. Thus the document made no affirmative misrepresentation at all. Given the conditional nature of the insurance enrollment as established by the other two documents, it cannot be argued that Salem's *omission* of a detailed description of the enrollment process rose to the level of a material misrepresentation.

None of the documents, then, individually supports the proposition that Salem made a material misrepresentation. Andre is thus compelled to fall back on the argument that the documents as a whole fostered the impression that he could sit back

---

**12.** Even though Andre proposes estoppel as a distinct basis of recovery, the same argument might also serve to rehabilitate his unsuccessful agency theory: If Salem lulled Andre into complacency, Andre could not fairly be held liable for his failure to exercise his means of self-protection.

and insurance would come to him. But he fails on that score as well.

To be sure, it must be said that the documents are not models of lucidity. Nowhere did Salem lay out step by step what Andre had to do to obtain coverage, and nowhere did it specify that he would eventually have to complete the Enrollment Form. Moreover, the brochure's use of the word "automatically" might perhaps induce a false sense of security in an employee who did not take care to put the word in context.

But ERISA bars only *material mis*representations. It does not impose an affirmative duty to explain benefit plans with the utmost clarity. Thus an employee's lack of care in reading corporate documents does not support the proposition that the company has misled the employee. No doubt it is possible for an employer to issue documents so garbled and ambiguous, so apt to mislead, that the employer would later be estopped from denying benefits although it had made no specific misrepresentations. But that is not this case. Salem's documents were clear enough to put Andre on notice that his enrollment in the health plan would not occur without some further effort on his part.

### 3. Summary

Andre's agency and estoppel theories are legally insufficient to support a judgment against Salem. This conclusion rests on the application of the law to the undisputed facts, and not on any pro-Salem factual inferences compelled by Rule 56. Hence no basis for potential liability remains that might justify a trial—as *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 503–04 (7th Cir. 1992) has recently said:

> The test for whether summary judgment has been properly granted is a simple one. It is whether, if the record of the summary judgment proceeding were the record of a trial, a jury or other trier of fact could rationally render a verdict for the nonmovant....

No trier of fact could rationally find Salem liable on the theories and evidence tendered by Andre. That means Andre's Rule 56 motion as to Salem must be denied, and Salem's cross-motion must be granted.

### Stepan

If Salem were in fact liable to Andre, Stepan's potential liability would likely evaporate. Andre's enrollment in the Salem plan—even if accomplished retroactively by court order—could (though it would not necessarily) cut off any entitlement to continuing COBRA coverage through Stepan (Section 1162(2)(D)(i)). Salem is now free of any liability, however. That compels consideration of the merits of Andre's claim against Stepan.

### 1. *Timeliness of Andre's Effort To Reinstate*

■ Section 1162(2)(C) specifies:

> The payment of any premium ... shall be considered to be timely if made *within 30 days of the date due* or within such longer period as applies to or under the plan.

Stepan's plan did not permit late payment beyond the 30–day period prescribed by statute. Andre had to make payment on February 1 to obtain coverage for the month of February, but he made no payment. Thus Section 1162(2)(C) granted him a 30–day grace period to cure the nonpayment on February 1.

Rule 6(a) determines the scope of the 30–day period "within" which Andre could have reinstated coverage:

> In computing any period of time prescribed or allowed by these rules ... or by any applicable statute, the day of the act, event or default from which the designated period of time begins to run shall not be so included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday ... in which event the period runs until the end of the next day which is not one of the aforementioned days.

This method applies equally to time periods set by the Rules and to time periods set by "applicable statute[s]" that, like COBRA, also supply the substantive law of the case (see, e.g., *Kim v. Commandant, Defense Language Institute, Foreign Language*

*Center,* 772 F.2d 521, 524 (9th Cir.1985) (per curiam), construing 60–day limit of Rule 12(a); *Quave v. Progress Marine,* 912 F.2d 798, 800 (5th Cir.1990), construing 10–day limit of Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 914(f); *Simmons v. Firestone Tire & Rubber Co.,* 747 F.Supp. 1256, 1257–58 (W.D.Tenn.1990) (ERISA case construing time limit in benefits agreement)). And when construing a statute that requires performance of an act "within" a certain number of days, courts consistently treat as timely an act performed on the last day of the specified period (see, e.g., *Pearson v. Furnco Const. Co.,* 563 F.2d 815, 818–19 (7th Cir.1977) (filing on 90th day after issuance of right-to-sue letter was timely under Title VII); *Wiss v. Weinberger,* 415 F.Supp. 293, 294 (E.D.Pa.1976) (filing on 61st day after Secretary's adverse decision was one day too late, under 60–day rule of Social Security Act)).

Andre's February payment came due on February 1st. Hence his statutory 30–day grace period began on February 2 and ended on March 3—a Sunday. Under Rule 6(a) the period is automatically extended to include the next business day, March 4.

Just what did Andre have to do by March 4? COBRA requires payment, not mere inquiry, within 30 days after the due date for payment.[13] Yet that facial requirement cannot be mechanically applied in a case where the beneficiary's inquiry is timely and the insurer's response is not. Suppose that 25 days after a COBRA payment comes due a former employee asks whether he or she is eligible to reinstate coverage. Then the former employer takes 10 days to come up with a "yes" answer. It would be absurd to say that by delaying its answer—whether because of a genuine doubt or out of a desire to harm the employee—the employer could escape the statutory duty to insure.

If Andre had inquired of Stepan on or before March 4, Stepan would have been obligated to tell him immediately (and pre-sumably would have told him) to send in payment before the grace period expired. In that sequence the only reasonable assumption from the current record is that Andre would have made timely payment: He desperately needed coverage, and the fact that he tendered a check on March 12 indicates that he was able to pay for it. Nor is there anything to suggest that, if Andre had been told (accurately) on March 4 that he had to pay the premium that same day, he would have been unable to do so. On the other hand, suppose that under those circumstances Stepan did not respond to Andre until after the 30–day reinstatement period had elapsed. As already indicated, Andre would still have been entitled to make payment in that situation, and it is more than reasonable to believe that he would have done so.

Thus an inquiry to Stepan on March 4 would have been sufficient to reinstate Andre's COBRA coverage. Andre has testified (Dep. 20) that he placed his original call to Stepan on that very day. Yet later in his deposition Andre testified that he could not remember "the exact time lapse" between his contact with Salem and his contact with Stepan (*id.* 94). Diana Gullott, the Stepan employee with whom Andre spoke, has testified (Dep. 13) only that their conversation took place "sometime in early March." And speaking in its corporate voice, Stepan admits only that the conversation took place "[o]n or after March 4, 1991" (Stepan 12(n) ¶ 60).

Those conflicts in the evidence make it impossible to credit (on summary judgment) Andre's initial recollection of a March 4 inquiry. On Stepan's motion Andre is entitled to the reasonable inference that the conversation did take place on March 4, while on Andre's motion Stepan is entitled to the reasonable inference that it took place at some later date—but surely in early March (that had to be so, for on March 12 Andre tendered his check). This issue cannot be resolved without the presentation of additional evidence, or perhaps

---

**13.** That requirement of actual payment is also set out in Stepan's COBRA notice (Complaint Ex. A).

ultimately with the aid of a jury to assess the witnesses' memory and credibility.

### 2. *Stepan's Asserted Failure To Give Notice* [14]

█ Andre argues that given ERISA's strong policy of requiring disclosure of any change in benefits (Section 1001(b)), Stepan had to give notice before cancelling his coverage. Not only does Andre cite no cases that impose such a notice requirement under COBRA, but Stepan appears to have the better of the argument: As it points out, both the documents that Stepan provided to Andre and the COBRA statute (Section 1162(2)(C)) call for the automatic termination of benefits upon nonpayment of a required premium. Any notice requirement would seem to be at odds with that statutory language, though it might perhaps be possible to construct an argument for the opposite result.

But the issue need not be definitively resolved here. Even if notice were required Andre would still lose on *that* score, because his claim depends on a hopelessly tenuous theory of causation. Andre admits that he let the COBRA coverage lapse because he thought he was covered by Salem. Therefore the only reasonable inference is that any notice of cancellation from Stepan would have made not the slightest difference—Andre would simply have ignored it, because he had no interest in renewing that coverage.

At most Andre could argue that a notice of cancellation from Stepan might have prompted him to double-check with Salem to make sure that he was really covered (an argument made in passing at Andre R.Mem. 8). Presumably he would have then learned that he was not yet covered through Salem, which would have prompted him to ... do what? Promptly complete the Enrollment Form for Salem? Most

likely—in which case it would be ludicrous to hold Stepan liable. Send a check to Stepan? Hardly—that would call for a fanciful scenario such as Andre's being unsure of his ability to arrange immediate commencement of coverage through Salem, and thus deciding that he would rather be safe than sorry. But that fictional plot simply takes us too far from the actual facts of the case to support liability.

Just a few words should be said here about Andre's attempt to tack an Illinois-law claim onto his case against Salem. Andre's Complaint and First Amended Complaint mentioned only federal claims. But his Mem. 13 adds that Stepan has also assertedly violated the Illinois insurance law (Ill.Rev.Stat. ch. 73, ¶¶ 969.22, 979(2)) that requires 30 days' notice prior to cancellation of group health coverage.

Many potential flaws riddle that theory: the possibility of ERISA preemption; Congress' evident intention to allow automatic COBRA termination without notice; the procedural impropriety of belatedly raising in the brief a theory not raised in the Complaint; and the failure to allege, much less properly support, the existence of supplemental jurisdiction over the claim under 28 U.S.C. § 1367.[15] However, it is unnecessary to delve into any of those issues. Just as the lack-of-notice theory fails under ERISA because causation is absent, any similar theory under state law must fail as well.

It is ironic and unfortunate, to be sure, that Andre's mistaken belief as to Salem also has the effect of forbidding his recovery from Stepan on the theory now under discussion. But the chain of causation here is just too fragile, linked as it is only by a series of "what ifs," to withstand the tug of analysis before it breaks apart. It cannot justify submission of the question

---

**14.** This topic requires consideration only if Andre loses on the just-discussed question of timeliness of payment. If he prevails on that ground, the issue is of course moot. Accordingly the discussion in this section is framed as though Andre's tender of the premium came too late.

**15.** Stepan also argues that the cited Illinois statutes do not apply to Andre's situation at all, referring instead to Ill.Rev.Stat. ch. 73, ¶ 979e (a statute that deals specifically with the continuation of group coverage after the termination of employment). In light of the conclusion reached in the text, this Court is not called on to choose between the state-law statutory candidates offered up by the litigants.

to a jury, much less a summary judgment for Andre.[16]

### 3. *Tolling of 30–Day Grace Period* [17]

Andre also argues that his hospitalization and his bereavement leave, either singly or in combination, extended the 30–day grace period during which he could have reinstated his COBRA coverage through Stepan. If such tolling were indeed in order, Andre's request for reinstatement could have been timely as a matter of law even though not made within 30 calendar days.

COBRA does not specifically allow for tolling. But *Sirkin v. Phillips Colleges, Inc.*, 779 F.Supp. 751, 752 (D.N.J.1991) found a common-law tolling principle inherent in the statutory scheme:

> [W]here a person entitled to [COBRA] coverage has evidenced an intent to continue such coverage by making timely premium payments, and becomes physically or mentally incapacitated from knowing of the obligation or paying or arranging for payment of the premium, then such a person is entitled to reinstate such coverage by paying the amount due within a reasonable time after the disability ends or a representative is appointed to act for such person.

That statement seems entirely correct as a matter of law (or perhaps as a matter of equity). What poses difficulty here is rather the application of that legal principle to Andre's situation. As the ensuing discussion shows, it cannot be determined from the current record whether the tolling doctrine applies.

 One possible source of tolling may be eliminated immediately: Andre's week of bereavement leave cannot toll the 30–day grace period. Andre was undoubtedly distracted and busy during that week. But *Sirkin* properly requires a showing of "mental incapacity": that Andre was literally *unable* to mail a check to Stepan, or unable even to know that a check was due. No evidence suggests that he was incapacitated in any such sense. Instead his hopes must rest on the possibility that the heart attack left him "physically ... incapacitated from ... paying or arranging for payment of the premium."

This case presents a slightly different situation from *Sirkin*, where the plaintiff had manifested a present intent to continue COBRA coverage before the disability began. But for the advent of that plaintiff's disability, she would have sent in her regular monthly payment. By contrast, Andre had no such purpose at the time of his heart attack. His intention to renew COBRA coverage did not arise until March 4, when he learned that Salem would not honor his request for coverage. In fact, Andre did not even know until then that COBRA permitted the late payment of premiums. So the heart attack did not prevent Andre from acting on a preexisting intent to continue coverage.

That lack of prior intent does not kill Andre's tolling claim, however. Insurance claimants may take advantage of the 30–day statutory grace period whether their desire for coverage arises on the first or the thirtieth day. Nothing in the statute suggests a congressional desire to limit reinstatement based on when the desire to reinstate arises. COBRA specifically forbids the employer to condition coverage upon proof of insurability (Section 1162(4))—a sure sign that employees who become so ill during the grace period that they might not qualify for insurance as an original matter may still reinstate their old coverage. Any COBRA beneficiary who simply forgets to mail a payment may reinstate coverage, as may any beneficiary who unexpectedly gets sick or who has difficulty getting enrolled as planned in a new insurance program.

---

**16.** It is not technically possible to grant partial summary judgment for Stepan on the lack-of-notice issue, because Andre has advanced both theories in a single count of his Complaint. But there should be no doubt that Andre is not welcome to pursue the lack-of-notice theory any further.

**17.** This is another subject that requires consideration only if Andre were to lose on the basic question of timeliness dealt with earlier in this opinion. That point is taken up at the end of this section.

Because Congress did not limit the availability of the grace period to beneficiaries who intend but fail to make a timely payment, it would subvert that same statutory purpose to impose such limits on the availability of tolling. As *Sirkin*, 779 F.Supp. at 752 said:

> Principles of equity and common decency suggest that a person should not be deprived of desired and needed coverage when incapacitated from continuing it.

There is nothing like an unexpected illness to make a person "desire" insurance or take the steps necessary to bring coverage up to date. Certainly that sort of crisis could lead an employee to reinstate COBRA coverage if the employee were not confident of his or her insurance status with a new employer.

■ Yet the same sudden illness near the end of the 30–day grace period that makes a person "desire" COBRA coverage can easily render the person unable to make the necessary inquiries or payments. If that situation arises, tolling is the only way to preserve the employee's statutory right to reinstatement. Without tolling a former employee who gets *really* sick would be unable to obtain retroactive COBRA coverage, while an employee who is still well enough to mail in a check could obtain coverage—a topsy-turvy distinction that Congress surely did not intend to make.

Tolling is available, then. That conclusion leads to the twin questions of just how much tolling is permitted by law, and just how much is justified by the facts of this case.

As for the legal question, *Sirkin*, 779 F.Supp. at 758 holds that the COBRA beneficiary may reinstate coverage within "a reasonable period" after the disability lifts or a representative is appointed to act for the beneficiary. That may or may not be the best rule—a good deal may be said for a bright-line rule (at least in the physical disability situation, where no resort to a personal representative plays any part) that would require a beneficiary to act within a period equal to 30 days plus the duration of the disability.[18]

■ It is not appropriate to resolve that legal issue at this point, however, because clarification of the facts may make the issue moot. Earlier in this opinion it was established that Andre's first request for reinstatement—if timely—was enough to trigger Stepan's statutory duty to reinstate him. It was also established that the date of that request is currently unclear. Suppose, though, that Andre could prove that he made the request on March 5 or 6. In that case he would need to prove but one or two days of genuine physical incapacity, a period so short that he would be entitled to the benefits of tolling under either the "reasonable period" or the duration-of-incapacity approach.

As for the factual issue, temporary hospitalization may support a finding of incapacity sufficient to justify the failure to perform a legal duty (see *Diacou v. Palos State Bank*, 65 Ill.2d 304, 312, 2 Ill.Dec. 351, 354, 357 N.E.2d 518, 521 (1976)). But it is not enough merely to allege hospitalization, without offering proof of the specific limitations imposed by the hospitalization and the time frame of those limitations (*id.*) Was Andre allowed to receive visitors, make phone calls or send and receive mail? Was he sufficiently alert and vigorous that he could have taken care of his insurance problems without creating a risk of complications?

No herculean effort was required here: Apparently all Andre had to do was to call Salem and learn that he was uninsured, call Stepan and confirm that he was eligible to reinstate coverage, then mail a check (or have one delivered) to Stepan.[19] Still, none

---

**18.** Perhaps the "reasonable period" rule might be a preferable alternative if the disability were to occur so early in the statutory 30–day period that it would be reasonable to require the beneficiary to act *within* the 30 day time frame, thus tacking on nothing by way of tolling. That

would not seem to be the case here, but that question also remains for future resolution.

**19.** Here the chain of causation is not so tenuous as it is in the lack-of-notice claim rejected earlier. After the heart attack, it is safe to assume, Andre would have taken the surefire route of

of the evidence submitted on the current motions makes it clear whether Andre could or could not reasonably have made the necessary effort. It is therefore impossible to grant summary judgment for either Stepan or Andre on a tolling theory.

### 4. *Summary*

Depending on the date of his request for reinstatement—a date as yet unproved—Andre may be able to prove that the request was timely without resort to tolling. If he were forced to resort to his lack-of-notice claim against Stepan, he would fail. But his tolling claim, if he needs it, survives. Both Andre's and Stepan's motions for summary judgment are consequently denied.

### *Conclusion*

Andre is not entitled to a judgment as a matter of law against Salem or Stepan. Hence his Rule 56 motion is denied in its entirety. As to Salem there is no genuine issue of material fact, and it is entitled to a judgment against Andre as a matter of law. Salem is therefore dismissed as a defendant to this action. Stepan is not entitled to a like judgment, and its Rule 56 motion is denied.

Counsel for Andre and Stepan are directed to appear before this Court at 8:45 a.m. on July 21, 1992 for a status hearing to discuss the future course of proceedings. Counsel for Salem is directed to appear at the same time to discuss, together with counsel for Andre, the issue of finality of Salem's dismissal.[20]

restoring coverage through Stepan instead of quarreling with Salem about whether he was really covered.

**20.** Because none of the litigants focused on the consequences of a partial rather than total disposition of the case, Rule 54(b) has not been addressed in the briefs. Between now and the status hearing counsel for Salem and Andre should research the relevant authorities (among them *National Metalcrafters v. McNeil*, 784 F.2d 817, 820–21 (7th Cir.1986)).