T.J. KENNEDY, Plaintiff–Appellant,

v.

**CONNECTICUT GENERAL LIFE INSURANCE CO., Defendant–Appellee.**

No. 90–2283.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1991.

Decided Feb. 7, 1991.

---

Francis Van Hooreweghe, Van Hooreweghe, Fackel & Thuline, Moline, Ill., for plaintiff-appellant.

Thomas J. Shields, Peter Benson, Lane & Waterman, Davenport, Iowa, David De-Doncker, John DeDoncker, Lane & Waterman, Rock Island, Ill., for defendant-appellee.

Before FLAUM, EASTERBROOK, and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

A.D. Huesing Corp. furnished its employees with medical care under a group health policy issued by Connecticut General Life Insurance Co. (CIGNA). The master policy covers 80% of specified expenses, and the employee must put up the other 20%. Co-payments sensitize employees to the costs of health care, leading them not only to use less but also to seek out providers with lower fees. The combination of less use and lower charges (together with the 20% reduction in insured payments in the event care is furnished) makes medical insurance less expensive and enables employers to furnish broader coverage (or to pay higher wages coupled with the same level of coverage).

Providers of medical care may seek to increase their business by promising to waive the co-payments. Patients prefer the lower outlays, but waivers annul the benefits of the co-payment system. Insurers have trouble policing the rules, because they do not know how much (or, even whether) the patient paid the provider directly. Now and again, however, an insurer suspects evasion and demands proof of compliance. CIGNA made such a demand of T.J. Kennedy, a chiropractor who submitted a bill of $1,727 for services furnished to Karla Myers, the wife of one of Huesing's employees. CIGNA wanted Kennedy's assurance that the bill reflected 80% of Kennedy's reasonable and customary charge to patients. When a provider routinely waives co-payments, a fee stated as 80% of the charge is a phantom number. Instead of charging $100, collecting $20 from the patient and $80 from the insurer, the provider may announce a fee of $125, waive the co-payment, and collect $100 from the insurer. The patient who will not be called on to pay doesn't care. Kennedy responded to CIGNA's demand by furnishing a copy of his contract with Myers, which confirmed the insurer's suspicions. Kennedy had agreed to accept as full compensation whatever the insurer would pay. CIGNA then refused to pay Kennedy a dime. He filed suit in state court as assignee of Myers' claim against the insurer; CIGNA removed it to federal court, as it could because the claim necessarily rests on the Employee Retirement Income Security Act (ERISA). *Franchise Tax Board of California v. Construction Laborers' Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). See also *Ingersoll–Rand Co. v. McClendon,* —— U.S. ——, 111 S.Ct. 478, 485–86, 112 L.Ed.2d 474 (1990).

■ CIGNA contended in the district court that ERISA does not allow providers of medical services to sue insurers. Under 29 U.S.C. § 1132(a)(1)(B) only a "participant" in a plan or a "beneficiary" is entitled to file suit to collect. CIGNA added for good measure that whether someone may transfer benefits to a third party, as

Myers tried to do, is a question of contract, and that the master insurance policy allows an assignment to a provider only with CIGNA's consent, which it had withheld. Despite the obligation of every federal court to examine its own jurisdiction before discussing the merits, the district court ignored both of these obstacles. In this court the parties have followed this "lead" —CIGNA because it wants a precedent supporting its position on the merits, Kennedy because he wants the money. At oral argument counsel treated jurisdiction as something the parties had worked out to their own satisfaction. Not so. Lawyers have obligations to the judicial system as well as to their clients, and one of the premier obligations is to ensure that the tribunal has jurisdiction. Sometimes lawyers do not recognize jurisdictional issues lurking in a case; having debated jurisdictional issues in the district court, counsel for CIGNA and Kennedy have no such excuse. Both lawyers failed to fulfill professional duties when they let the jurisdictional issues pass in silence in their briefs to us.

Three courts of appeals have taken three approaches to the question whether an assignee may sue. *Northeast Department ILGWU Health & Welfare Fund v. Teamsters Local No. 229 Welfare Fund*, 764 F.2d 147, 153–54 & n. 6 (3d Cir.1985), holds that the statutory list is exclusive, and that because Congress did not mention assignees, they may not sue on the authority of § 1132(a)(1)(B). On different theories, the judges went on to hold that an effort to enforce ERISA's substantive rules states a claim under federal common law, for which 28 U.S.C. § 1331 supplies jurisdiction. *Misic v. Building Service Employees Health & Welfare Trust*, 789 F.2d 1374 (9th Cir. 1986), treating the question as one of "standing", concluded that assignees may stand in the shoes of beneficiaries. It relied on *United States v. Carter*, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776 (1957), which resolved in favor of jurisdiction a similar question under the Miller Act, 40 U.S.C. § 270a. *Hermann Hospital v. Meba Medical & Benefits Plan*, 845 F.2d 1286, 1289–90 (5th Cir.1988), agrees with

*Misic* that an assignee has standing—it has a personal stake in the outcome—but adds that the plaintiff must be an authorized claim-holder under both ERISA and the contract. *Hermann* holds that ERISA permits the transfer, for the anti-assignment clause governing pension benefits, 29 U.S.C. § 1056(d)(1), does not apply to welfare benefits. Contractual rights were obscure, and the fifth circuit remanded so that the district judge could explore the validity of the assignment.

As we see things, a combination of statutory text and *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), shows that § 1132(a)(1)(B) supplies jurisdiction when a provider of medical services sues as assignee of a participant. ERISA defines a "beneficiary" as "a person designated by a participant ... who is or may become entitled to a benefit" under the plan. 29 U.S.C. § 1002(8). Myers, unquestionably a "participant" as § 1002(7) uses that term, designated Kennedy as the person to receive her benefits. That makes Kennedy a "beneficiary". To the extent doubt remains, *Firestone* tells us to treat as a "participant" for jurisdictional purposes anyone with a colorable claim to benefits, 489 U.S. at 117–18, 109 S.Ct. at 957–58, an approach equally applicable when a person claiming to be a "beneficiary" files suit. Kennedy has a colorable claim. Because ERISA instructs courts to enforce strictly the terms of plans, see 29 U.S.C. § 1104(a)(1)(D) and *Central States Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir.1989) (in banc), an assignee cannot *collect* unless he establishes that the assignment comports with the plan. But as *Firestone* held, subject-matter jurisdiction depends on an arguable claim, not on success. See also *Sisters of the Third Order of St. Francis v. Swedish American Group Health Benefit Trust*, 901 F.2d 1369, 1370 (7th Cir.1990). Only if the language of the plan is so clear that any claim as an assignee must be frivolous is jurisdiction lacking. *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Goosby v. Osser*, 409 U.S. 512, 518, 93 S.Ct. 854, 858, 35 L.Ed.2d 36

(1973). Kennedy's claim is colorable. Section 20 of CIGNA's policy provides that "medical benefits are payable to the Employee. However, at the option of the Insurance Company and with the consent of the Policyholder, all or any part of the medical benefits may be paid directly to the person or institution on whose charge the claim is based." The possibility of direct payment is enough to establish subject-matter jurisdiction. Whether CIGNA properly withheld assent to the transfer goes to the merits rather than jurisdiction.

■ CIGNA gave the district court three reasons why it had not paid Kennedy's bill. One, it did not assent to the transfer; two, it believed that Kennedy had overstated his usual charges; three, § 12(5) of the policy excused payment. The first of these reasons depends on § 20 of the policy, which we have quoted. The second is not so much an argument that Kennedy's fee for services to Myers was unreasonable as it is an objection to the waiver of copayments. To see this, suppose Kennedy regularly states a fee of $1,000 for a particular service and excuses copayments, collecting $800 from an insurer. Then his full customary remuneration for services is $800, and CIGNA's 80% share would be $640. Kennedy tried to collect more, leading to CIGNA's objection. The district judge did not discuss this contention (or the first one) and awarded summary judgment to CIGNA based on the third argument. Section 12 of the policy provides that "[n]o payment will be made for expenses incurred ... (5) for charges which the Employee or Dependent is not legally required to pay". By promising that he would look exclusively to CIGNA for payment, Kennedy relieved Myers of any legal obligation to pay. So Kennedy's charge *to the patient* was zero, and 80% of nothing is nothing.

Kennedy objects to this reasoning by observing that he rendered services in anticipation of payment. He did not donate medical care, as public agencies sometimes do. Clauses such as § 12(5) exclude payment in such cases. *United States v. Metropolitan Life Insurance Co.*, 683 F.2d 1250 (9th Cir.1982); *New Mexico v. Eq-*

*uitable Life Assurance Society*, 447 F.2d 620 (10th Cir.1971); *United States v. St. Paul Mercury Indemnity Co.*, 238 F.2d 594 (8th Cir.1956). Kennedy insists that the contract should be treated as an assignment rather than as a reduction in price. That might be the best way to look at the Kennedy–Myers contract if it made Myers secondarily liable. But the district court concluded that the contract excused Myers from paying. Such a contract is the principal device by which a provider of medical care waives co-payments. It allowed Kennedy to say that his reasonable and customary fee was some $2,150 even though he never planned to collect more than $1,727 from anyone. Section 12(5) helps CIGNA combat this tactic. It means that the patient must be legally responsible for the whole charge, so that after CIGNA pays its 80% the patient still has 20% left to go.

Kennedy has two ways out. One is to say that even if his customary fee was not $2,150, it was $1,727 (80% of that), of which CIGNA should pay 80%. This 64% solution still leaves the patient without financial incentive to reduce demands on medical care or to shop around, and CIGNA might say that a fee of $1,727 is no more real than is a charge of $2,150. It wants assurance that the patient has given enough thought to the need for (and price of) this medical care to be willing to pay. Patients who pay nothing have no reason to moderate their demands for medical service, and providers may inflate the bill so that even 64% comes out to the target. CIGNA accordingly wants to pay only 80% of what the provider customarily seeks as his entire compensation. Kennedy has not sought the 64% solution in this court, so we need not decide whether it is available. Kennedy's other way out depends on his contract with Myers. One provision states: "This agreement void [sic] to the extent prohibited by law, the terms of Patient's insurance policy, or if the benefits payable under this agreement are less than they would be if not subject to this agreement."

Here we encounter delicious circularity. The agreement relieves Myers of any obligation to pay. That triggers § 12(5) of the

policy, which relieves CIGNA of any obligation to pay. That in turn triggers the clause of the Kennedy–Myers contract *reinstating* Myers' obligation to pay. Once this occurs, § 12(5) of the policy is no longer applicable. Thus CIGNA must pay. Kennedy stops here. Let us press on: once CIGNA becomes liable, the Kennedy–Myers contract again relieves the patient of any legal obligation. Which in turn reactivates § 12(5). And so it goes.

Where one breaks this circle depends not on formal logic but on the function of the two contracts. The Kennedy–Myers contract is designed to eliminate co-payments. Huesing's plan and CIGNA's policy require co-payments in order to maintain incentives that hold down the cost of medical care. We could not break the circle in favor of reimbursement without abrogating the co-payment requirement—a requirement that Huesing had every legal entitlement to create. So Kennedy must lose. If he wishes to receive payment under a plan that requires co-payments, then he must collect those co-payments—or at least leave the patient legally responsible for them. (What happens if a provider bills his patients for the 20% but never follows up is a question we need not answer.) Kennedy observes that the patient's rich aunt or best friend may pay the 20% and asks rhetorically: Why can't the doctor pay? The answer is contractual: Because the plan and policy say that the physician must create a legal obligation in the employee or dependent. And there is a good reason for this contractual solution. Allowing the provider to "pay" the co-payment to himself is just another way to describe waiver of co-payments, with the baleful consequences we have mentioned. Some welfare benefit plans have lower (or no) co-payments, perhaps because they doubt that the incentive effects of co-payments justify saddling with higher costs those employees unlucky enough to encounter medical difficulties. Co-payments mean more risk borne by participants. Whether full indemnity is preferable to a co-payment system is a question for the marketplace. The answer in this health plan is co-payments, and its terms will be enforced.

AFFIRMED