In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2544

NEUMA, INCORPORATED, an Illinois

corporation,

Plaintiff-Appellant,

v.

AMP, INCORPORATED and PROVIDENT LIFE AND
ACCIDENT INSURANCE COMPANY,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 6616- Paul E. Plunkett, Judge.

ARGUED JANUARY 10, 2001--DECIDED August 7, 2001

  Before RIPPLE, KANNE and WILLIAMS, Circuit
Judges.

  RIPPLE, Circuit Judge.  Neuma, Inc.
("Neuma") filed this suit against AMP,
Inc. ("AMP"). It alleged four causes of
action arising from AMP's failure to
maintain group life insurance benefits
for Stanley Larsen, a former AMP
employee./1 Larsen previously had
assigned all of the rights to his life
insurance benefits to Neuma. The district
court rejected Neuma's claim for benefits
under Section 502(a) (1)(B), 29 U.S.C.
sec. 1132(a)(1)(B), of the Employee
Retirement Income Security Act, 29 U.S.C.
sec. 1001, et seq., ("ERISA"), because it
found that AMP's actions were justified
based on an unambiguous provision of the
Summary Plan Description that governed
Larsen's life insurance policy. The court
also denied Neuma's claim under Section
502(c) of ERISA, 29 U.S.C. sec. 1132(c),
which alleged that AMP had failed to
provide documents relating to an employee
welfare benefit plan within a required
thirty-day statutory period. It found
that Neuma was not entitled to the
documents because it did not have a
"colorable claim" for the life insurance
benefits at issue. The court also
dismissed Neuma's state law negligent
misrepresentation claim without prejudice

to its right to refile in state court. The district court refused to exercise supplemental jurisdiction over this claim because it had dismissed all federal claims. For the reasons set forth in the following opinion, we affirm the judgment of the district court regarding Neuma's claim for benefits under Section 502(a)(1)(B). We reverse and remand with respect to the claim that AMP failed to provide plan documents in a timely manner under Section 502(c). Lastly, we also reverse the district court's dismissal of the negligent misrepresentation claim and remand that claim to the district court for further proceedings.

I

BACKGROUND

A.  Facts

On March 31, 1987, Larsen was hired by AMP to work in its AMP Circuits Division. AMP provides its workers with benefits that include medical, dental and life insurance coverage. During 1996 and 1997, the life insurance coverage that AMP provided for its employees was issued by Provident Life & Accident Insurance Company ("Provident") and was funded through Group Policy No. N-377 (the "Policy" or the "Provident Policy"). On January 1, 1996, Larsen enrolled in AMP's life insurance program for benefits in the amount of $81,600. The contours of these life insurance benefits were described in greater detail in a booklet provided to AMP employees, entitled "Group Benefits Program for Employees of AMP Circuits, an AMP Division." R.42, Ex.6. This booklet (the "Summary Plan Description") contained the following clause pertaining to disabled employees (the "Disability Clause"):

Insurance During Disability Before Age 60 If you become disabled before age 60, and while insured, [AMP] will keep your life insurance in force by paying the appropriate premium as long as you are disabled, provided proofs of disability are furnished as required. In no event, however, will such insurance be continued beyond the date the life insurance provisions of the Plan terminate.

Id. at 19 (emphasis added). Another provision in the Summary Plan Description

gave AMP the "right to terminate, suspend, withdraw, amend or modify the Plan at any time." Id. at 9.

On March 14, 1996, Larsen was placed on disability status by AMP. At some point thereafter, Neuma began negotiating with Larsen to purchase the rights to his group life insurance benefits. As a part of this process, Neuma requested and received some basic information from AMP regarding the details of Larsen's life insurance coverage. On September 5, 1996, Larsen assigned all of his rights, title and interest in his group life insurance coverage to Neuma, an assignment acknowledged and accepted by AMP. Then, on March 14, 1997, one year after Larsen became disabled, he was terminated by AMP pursuant to company policy.

By the end of 1997, AMP had decided to change its group life insurer. On December 31, 1997, AMP cancelled the Provident Policy and purchased group life insurance with MetLife Insurance Company ("MetLife") that went into effect on January 1, 1998. The life insurance coverage provided in the MetLife policy was identical to that provided by Provident in all material respects. AMP did not enroll Larsen for coverage under the MetLife policy. When the Provident Policy was discontinued, Larsen's group life insurance coverage with AMP was terminated.

On August 6, 1998, Neuma requested that AMP provide it with copies of various documents relating to the Provident Policy and any larger employee benefit plan of which the Policy was a part, pursuant to 29 U.S.C. sec. 1024(b)(4) of ERISA. On October 20, 1998, Neuma filed suit against the defendants, seeking penalties under ERISA Section 502(c) for AMP's failure to respond to this document request and seeking a declaratory judgment to declare the rights and obligations of the parties under the insurance policy. AMP did not reply to Neuma's request for plan information until December 10, 1998, when it provided Neuma with a copy of what Neuma claims was an outdated version of the Summary Plan Description. On February 17, 1999, AMP, through its attorneys, provided more information regarding Larsen's group life insurance benefits to Neuma, including an updated version of the Summary Plan

Description in force at the time when Larsen's coverage was ended.

On January 18, 2000, Neuma filed a first amended complaint (the "complaint") against the defendants, alleging four causes of action relating to AMP's failure to maintain group life insurance benefits for Larsen after the Provident Policy was terminated on December 31, 1997. Count I of the complaint sought, pursuant to ERISA Section 502(a)(1)(B), the full recovery of Larsen's life insurance benefits in the amount of $81,600 if Larsen was deceased, or, if Larsen was living, an order for AMP to purchase and maintain a policy in that amount on his life. Neuma alleged that AMP should not have discontinued these benefits under the terms of the Summary Plan Description. Count II alleged an Illinois state law cause of negligent misrepresentation, due to alleged omissions and false statements of fact made by AMP during its correspondence with Neuma prior to Neuma's purchase of Larsen's benefits. Neuma claimed that these misrepresentations caused it to suffer damages by purchasing benefits that were less valuable than what it had anticipated. Count IV of the complaint again alleged a claim under Section 502(c) of ERISA, based on AMP's failure to respond to Neuma's requests for plan documents within the thirty-day time limit mandated by that section of the Act./2

B.  District Court Proceedings

On January 18, 2000, Neuma filed a motion for summary judgment as to Count I of its complaint. In response, AMP filed a cross-motion for summary judgment on that count, as well as a motion for summary judgment on the other remaining counts.

In its order of May 18, 2000, the district court ruled on these motions. With respect to Count I, Neuma's request to recover benefits, the court found in favor of AMP. AMP had argued that any dispute on this point was resolved by the language of the Disability Clause in the Summary Plan Description, which stated that "[i]n no event . . . will [life insurance for disabled employees] be continued beyond the date the life insurance provisions of the Plan

terminate." R.42, Ex.6 at 19. AMP claimed that the language of the Summary Plan Description clearly identified the "Plan" as the Provident Policy, and that because it had the right to and did terminate that Policy on December 31, 1997, it no longer had any obligation to pay Larsen's life insurance premiums after that date. In contrast, Neuma maintained that AMP's life insurance program was one part of a more comprehensive employee benefit plan that also included medical and dental insurance (the "Benefit Plan"). It contended that, when the Disability Clause referred to the "Plan," this reference was not to the Provident Policy, but to a larger Benefit Plan as a whole, and it claimed that extrinsic evidence it presented had established that fact conclusively. Therefore, because AMP continued to provide some form of life insurance to its employees (through the MetLife policy) after it cancelled the Provident Policy, Neuma argued that the "life insurance provisions of the Plan" had not terminated when the Provident Policy was cancelled and that AMP should have continued to pay Larsen's premiums after that date. In ruling for AMP on this issue, the district court held that the unambiguous language of the Summary Plan Description showed that the "Plan" referred to in the Disability Clause was the Provident Policy, not a more comprehensive Benefit Plan run by AMP. The key piece of evidence for the district court was that, at the beginning of the Summary Plan Description, it explicitly stated that any usage of the term "Plan" in that document referred to Provident Policy No. N-377. The court then found that, because the Summary Plan Description allowed AMP to terminate the "Plan" at any time, and, because the Disability Clause explained that disabled employees will not continue to receive life insurance benefits after the "life insurance provisions of the Plan terminate," AMP's obligation to pay Larsen's life insurance premiums ended when the Provident Policy was cancelled. Therefore, AMP's motion for summary judgment on Count I was granted./3

As to Count IV, Neuma's allegation that AMP did not respond in the proper ERISA-mandated time period to its request for plan documents, the court also granted summary judgment for AMP. It held that,

when Neuma made its request for information, Neuma was not a plan "beneficiary" entitled to those documents under ERISA, because it did not have a "colorable claim" that it would prevail in a suit for benefits. In the court's view, the clear language of the Summary Plan Description explained that AMP's obligation to pay Larsen's life insurance premiums ended on December 31, 1997, the date AMP discontinued the Provident Policy.

Lastly, with regard to Count II's state law negligent misrepresentation claim, the district court declined to exercise supplemental jurisdiction because it had dismissed all of the federal claims in the lawsuit. Accordingly, it dismissed Count II without prejudice to Neuma's refiling the claim in state court.

II

DISCUSSION

A.  Introduction

1.

Neuma contends that the district court erred in its disposition of Counts I, II and IV. As to Count I, it submits that the district court's interpretation of the word "Plan" in the Disability Clause was incorrect. In Neuma's view, the language of the Summary Plan Description is at least ambiguous in this regard, and, indeed, suggests strongly the opposite conclusion: that the word "Plan" means the comprehensive AMP Benefit Plan covering medical, dental and life insurance. Neuma contends that it has provided, but the district court disregarded, extrinsic evidence that supports such an interpretation. Second, Neuma claims that the district court erred in its ruling on Count IV. It contends that it is certainly a "beneficiary" under the meaning of ERISA and therefore is entitled to invoke the provisions of Section 502(c) because it has at least a "colorable claim" for benefits under ERISA. Neuma points out that, even if it did not ultimately succeed, its claim was at least "colorable" because it had an arguable chance of success and was not frivolous. Lastly, Neuma maintains that the district court erred in dismissing Count II's

negligent misrepresentation claim because the district court had diversity jurisdiction, not supplemental jurisdiction, over that claim.

2.

The district court disposed of Counts I and IV by granting summary judgment to AMP. We apply a de novo standard of review to the district court's decision. See Thomas v. Pearle Vision, Inc., 251 F.3d 1132, 1136 (7th Cir. 2001). Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, we consider the evidence in the light most favorable to the non-moving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Grun v. Pneumo Abex Corp., 163 F.3d 411, 419 (7th Cir. 1998), cert. denied, 526 U.S. 1087 (1999). This court has noted that cases involving the interpretation of contractual documents are particularly well-suited to disposition on summary judgment. See Grun, 163 F.3d at 419; Ryan v. Chromalloy Am. Corp., 877 F.2d 598, 602 (7th Cir. 1989).

With respect to Count II, we review a district court's dismissal for lack of subject matter jurisdiction de novo. See LaBonte v. United States, 233 F.3d 1049, 1052 (7th Cir. 2000); Haven v. Polska, 215 F.3d 727, 731 (7th Cir.), cert. denied, Haven v. Republic of Poland, 121 S. Ct. 573 (2000).

B. Recovery of Benefits Under Section 502(a)(1)(B) of ERISA

We first examine Neuma's allegation that AMP improperly discontinued Larsen's group life insurance benefits after it cancelled the Provident Policy at the end of 1997. As an initial matter, both parties agree that the AMP life insurance program that Larsen enrolled in is an "employee welfare benefit plan" as defined by ERISA. ERISA defines such plans as "any plan, fund, or program . .

. established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, [or] death." 29 U.S.C. sec. 1002(1)(A). AMP contends that this life insurance program constitutes an entire benefit plan unto itself. Neuma, however, claims that the life insurance program was but one part of a larger Benefit Plan provided by AMP, entitled the "AMP AKZO Corporation Medical, Dental, Life Insurance Plan," which also included medical and dental insurance./4

ERISA plans are governed by written documents that define their scope; the statute requires that "[e]very employee benefit plan . . . be established and maintained pursuant to a written instrument." 29 U.S.C. sec. 1102(a)(1). "Through those instruments, the parties are free to subject such welfare benefits to vesting requirements not provided by ERISA, or they may reserve the power to terminate such plans." Ryan, 877 F.2d at 603. ERISA requires that employers provide these documents to their employees to protect their interests as participants in employee welfare plans. See Panaras v. Liquid Carbonic Indus. Corp., 74 F.3d 786, 788 (7th Cir. 1996) (citing 29 U.S.C. sec. 1001(b)).

Although they dispute the nature of the ERISA plan at issue, the parties agree that the plan document that describes the contours of Larsen's life insurance benefits is the Summary Plan Description. Apparently, there are no other existing plan documents that relate to the group life insurance benefits at issue in this litigation. The disagreement between the parties centers on a key provision of that Summary Plan Description, the Disability Clause. This clause explains AMP's responsibilities to employees such as Larsen who become disabled before age 60, with regard to the payment of life insurance premiums. It states that, if a policyholder becomes disabled, AMP "will keep [his] life insurance in force by paying the appropriate premium as long as [he is] disabled." R.42, Ex.6 at 19. Yet, it further states that "[i]n no event, however, will such insurance be continued

beyond the date the life insurance provisions of the Plan terminate." Id. The meaning of the word "Plan" in the clause is crucial.

Neuma claims that "Plan" refers to a larger medical, dental and life insurance plan that AMP provided to its employees, of which the Provident Policy was merely a part. Under this interpretation, AMP was obligated to continue paying Larsen's life insurance premiums as long as the life insurance provisions of that larger Benefit Plan remained in effect. Therefore, because AMP continued to provide life insurance coverage to its employees through MetLife after it cancelled the Provident Policy, it should have continued to provide coverage to Larsen under the Disability Clause even after the Provident Policy was replaced by the MetLife policy. AMP counters that, in the Summary Plan Description, "Plan" clearly refers to the Provident Policy, and that, when that policy was cancelled, its obligation to provide group life insurance benefits to Larsen also ended.

In interpreting the language of the Disability Clause, we must apply federal common law rules of contract interpretation. See, e.g., Grun, 163 F.3d at 419; Brewer v. Protexall, Inc., 50 F.3d 453, 457 (7th Cir. 1995). "Those rules direct us to interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience." Brewer, 50 F.3d at 457 (citation and quotation marks omitted). In attempting to interpret such plans, our first task is to determine if the contract at issue is ambiguous or unambiguous. See Grun, 163 F.3d at 420; Ryan, 877 F.2d at 602. Contract language is ambiguous if it is susceptible to more than one reasonable interpretation. See Grun, 163 F.3d at 420; Brewer, 50 F.3d at 458. If a district court determines that the provision is without ambiguity, we have noted that "it need not consider extrinsic evidence" and should "proceed to declare the meaning" of the provision. Ryan, 163 F.3d at 602; see also Moriarty v. Svec, 164 F.3d 323, 330 (7th Cir. 1998); Swaback v. Am. Info. Techs. Corp., 103 F.3d 535, 541 (7th Cir. 1996). Thus, if a document governing an ERISA plan is unambiguous, this court will not look beyond its "four corners" in interpreting its meaning. Mathews v. Sears Pension

Plan, 144 F.3d 461, 466 (7th Cir. 1998).

In reviewing the Summary Plan Description, we believe that the document unambiguously equates the term "Plan" with the Provident Policy. The Disability Clause therefore absolved AMP of the responsibility to continue to pay Larsen's life insurance premiums after it discontinued that Policy.

The most compelling passage from the Plan in this regard, which the district court highlighted prominently in its opinion, is located on page 5 of the Summary Plan Description, before any of the substantive provisions of that document. It appears in a letter from Provident's president and chief executive officer that specifies the following:

PROVIDENT
LIFE AND ACCIDENT
INSURANCE COMPANY

Chattanooga, Tennessee
(herein called the Provident)

Certifies that it has issued Group Policy No. N-377
(herein called the Plan) to

AMP CIRCUITS, AN AMP DIVISION
(herein called the Policyholder)

The Plan provides the benefits described on the following pages for certain employees covered under the Plan. This booklet gives the principal provisions of the Plan. The Plan alone constitutes the entire contract between the Provident and the Policyholder.

Employees become covered under the Plan as provided on a following page. This booklet becomes the employee's certificate of coverage while covered under the Plan.

The benefits and provisions described on the following pages are subject in all respects to the terms and conditions of the Plan.

[signature]
President and Chief Executive Officer
Provident Life and Accident
Insurance Company

R.42, Ex.6 at 5 (emphasis added). This

portion of the Summary Plan Description clearly states that Group Policy No. N-377, which all parties agree is the Provident Policy that covered Larsen, will be "herein called the Plan" in the remainder of the Summary Plan Description. Id. It then notes that the Provident Policy "provides the benefits described on the following pages" for employees covered under that Policy. Id. Moreover, the statement itself is signed by Provident's president, which suggests that the document that contains it refers exclusively to a Provident-related product. These statements provide direct and unambiguous evidence that the use of the term "Plan" in the Summary Plan Description (including the Disability Clause) refers to the Provident Policy.

Other textual passages in the Summary Plan Description support the same conclusion. On the cover of the booklet, along with its title ("Group Benefits Program for Employees of AMP Circuits, an AMP Division"), is a logo that reads: "Provident Life and Accident Insurance Company." Id. Moreover, the booklet itself has many provisions relating to life insurance and Provident, but it provides no direct reference to any other type of insurance or to a more comprehensive benefit plan. Additionally, a number of times in the document the word "Plan" is referred to in a way that appears to relate directly to a life insurance policy provided by Provident. Page 9 notes that certain representations "made to the employee by the Policyholder . . . about being covered for benefits under this Plan . . . shall: (a) not be considered as representations or statements made by, or on behalf of, the Provident; and (b) not bind the Provident for benefits under the Plan." Id. at 9 (emphasis in original). On page 21, the text explains that "[t]he Provident will pay to you the amount shown if the Dependant dies while covered under the Plan." Id. at 21. And on page 26 the document states that "[c]laims for benefits under the Plan are to be submitted to Provident" and that "[p]ayment of claims under the Plan will be made by the Provident." Id. at 26.

Neuma points to several other passages in the document to demonstrate ambiguity regarding the meaning of the word "Plan," but its arguments are not persuasive.

First, it notes that the document refers to the title of the "Plan" in a few different ways: on page 1, it refers to it as the "Life Insurance Plan;" on page 5's letter from Provident's president, the "Plan" is called "Group Policy No. N-377" and on page 25, the document states that "[t]he name of the Plan is [the] Employees Group Life Benefit Program." Id. at 1, 5, & 25. Neuma submits that, because they use different titles for the "Plan," these examples create confusion as to what that term means. We cannot accept this argument. Indeed, this argument supports AMP's interpretation of "Plan," not Neuma's. Each of these titles indicates a connection to a life insurance policy alone, such as the Provident Policy; none suggests a reference to a more comprehensive Benefit Plan containing medical, dental and life insurance plans.

Second, Neuma points to the Disability Clause itself, which states that AMP will not keep a disabled employee's life insurance benefits in force beyond the date that "the life insurance provisions of" the Plan terminate. Id. at 19. Neuma maintains that the only logical reading of this phrase suggests that the "Plan" must have provisions other than those relating to life insurance, because, if it did not, the phrase would be redundant. Therefore, it claims that, be cause the Provident Policy solely refers to life insurance coverage, to give effect to each word of the Disability Clause, the term "Plan" must identify a larger Benefit Plan that contains the Policy along with many other components. However, the passage in question must be read within the context of the entire document, including the specific provisions that we previously have noted. When evaluated in this context, the phrase highlighted by Neuma does not cause the term "Plan" to be susceptible to more than one reasonable interpretation. See Grun, 163 F.3d at 420. As we noted earlier, in many instances the Summary Plan Description either specifically equates the "Plan" with the Provident Policy or references the word in a way that can seemingly point to nothing other than the Policy. At no point does the document explicitly mention the more comprehensive Benefit Plan that Neuma refers to, or any form of medical or dental insurance. Read in this

context, the Disability Clause's reference to "the life insurance provisions of" the "Plan" appear to be simply the result of cautious drafting designed to distinguish those provisions of the Provident Policy from others concerned with administrative detail./5

Neuma notes that, even if we find that the term "Plan" is unambiguous, in limited circumstances parties may present objective extrinsic evidence to demonstrate that, although a contract appears unambiguous, a disputed term actually means something different from what it appears to mean on its face. See Rossetto v. Pabst Brewing Co., Inc., 217 F.3d 539, 542 (7th Cir. 2000), cert. denied, 121 S. Ct. 1191 (2001); Mathews, 144 F.3d at 466. This type of ambiguity is often referred to as latent or extrinsic ambiguity. See Rossetto, 217 F.3d at 542-43 (distinguishing latent ambiguity from patent ambiguity, which is ambiguity that is clear from the reading of a contract's language); Stone Container Corp. v. Hartford Steam Boiler Inspection & Ins. Co., 165 F.3d 1157, 1162 (7th Cir. 1999) (same). Neuma claims that the term "Plan" is, at the least, latently ambiguous, even if it is not ambiguous on its face. To support this assertion, it puts forward two pieces of extrinsic evidence.

Neuma first refers us to a separate summary plan description for the MetLife insurance policy that replaced the Provident Policy in providing life insurance coverage to AMP's employees. It notes that this document shows that, although the MetLife policy has a different policy number than the Provident Policy, it identifies a Plan Identification Number of "13-3429437-524," the same identification number as that located in the Provident Policy's Summary Plan Description. R.40, Ex.5D at 32. Neuma then assumes that this number must refer to the larger Benefit Plan and that its presence in the Provident Summary Plan Description demonstrates that the "Plan" referenced in that document must be the Benefit Plan. Second, Neuma refers to the 1997 and 1998 "Form 5500 Annual Return/Report of Employee Benefit Plan" (the "Form 5500s") submitted by AMP to the IRS in those years. These documents each appear to (1) identify a benefit plan entitled the "AMP

AKZO Corporation Medical, Dental, Life Insurance Plan," which includes a life insurance policy and a health maintenance organization ("HMO") policy that provides medical and dental coverage to AMP employees, and (2) state that this plan was not terminated in 1997 or 1998, respectively./6 Neuma then claims that, because these documents identify a more comprehensive benefit plan than one that simply included a life insurance policy, the "Plan" referenced in the Summary Plan Description must also equate to a larger AMP Benefit Plan.

With respect to the identification number "13-3429437-524," it is unclear as to what this number actually refers. Neuma has not put forward any evidence linking the number to a Benefit Plan that provides medical, dental and life insurance. By contrast, when Neuma's attorney asked Jacqueline Mooneyhan, a Human Resources Manager at AMP, about the fact that this same number was listed as an identification number in both the Provident and MetLife summary plan descriptions, she replied that this number was issued by the government and referred not to a larger Benefit Plan but only to AMP's life insurance plan./7

As for the Form 5500s, the district court questioned their accuracy, noting that the 1998 form incorrectly listed Provident as the life insurance carrier for that year, when in fact MetLife provided life insurance coverage for AMP employees at that time. See R.49 at 5 (noting that it "may be that other aspects of these [forms] are incorrect as well"). Regardless, even if the Form 5500s do reference a larger Benefit Plan, they cannot bring serious dispute to the fact that the word "Plan" in the Summary Plan Description refers to the Provident Policy.

We agree with the district court's determination that the Disability Clause's reference to the "Plan" clearly equated it with the Provident Policy. Therefore, because the Disability Clause specifically stated that AMP was responsible for paying Larsen's life insurance premiums only until "the life insurance provisions of the Plan terminate," AMP's obligation to pay those premiums ended on December 31, 1997. As a result, the court was correct in granting

summary judgment to AMP on Count I.

C. Failure to Produce Documents under
Section 502(c) of ERISA

In Count IV of its complaint, Neuma sought to recover penalties under Section 502(c) of ERISA, which requires plan administrators to provide information requested by plan participants or beneficiaries within thirty days of such a request, or face a statutory fine. See 29 U.S.C. sec. 1132(c) (1)(B)./8 Neuma had made this request to AMP by letter on August 6, 1998, when it asked to be provided with "a copy of the master [Provident] insurance policy, plan document and related amendments thereto, summary plan description and all other documents constituting the benefit plan and insurance policy under which the policy was maintained." R.47, Ex.A. This request was made pursuant to 29 U.S.C. sec. 1024(b)(4), one of ERISA's disclosure provisions, which requires that:

The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

AMP claimed that it did not receive this request until December 10, 1998./9 On that date, Mooneyhan sent a copy of what she claimed was the relevant summary plan description to Neuma, and stated that she was "not in possession of the master insurance policy, plan document and related amendments." Id., Ex.B. Neuma claims that the summary plan description provided by Mooneyhan at that time was outdated because it had been superceded by the Summary Plan Description described in this opinion on July 1, 1996. On February 17, 1999, AMP, through its attorneys, sent other documents to Neuma regarding the Provident Policy, including the updated Summary Plan Description and unsigned copies of other Provident group policy documents. On April 1, 1999, AMP's attorneys provided Neuma with signed copies of those Provident group policy documents.

Under ERISA, only a "participant" or a "beneficiary" is entitled to request such plan documents and seek penalties for the failure of their production. 29 U.S.C. sec.sec. 1024(b)(4) & 1132(c)(1)(B). Neuma claims that it was a "beneficiary," defined by ERISA as a "person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. sec. 1002(8). The parties do not dispute that Larsen designated Neuma as the recipient of his life insurance benefits. However, a party such as Neuma can demonstrate that it "may become entitled to a benefit," and therefore be considered a "beneficiary" for jurisdictional purposes, only if it can show that at the time it filed suit it had a colorable claim to vested benefits. See Riordan v. Commonwealth Edison Co., 128 F.3d 549, 552 (7th Cir. 1997); Kennedy v. Conn. Gen. Life Ins. Co., 924 F.2d 698, 700 (7th Cir. 1991) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117-18 (1989))./10 The district court held that Neuma had not made a colorable claim that it was due benefits because "the summary plan description . . . unambiguously equates the Provident Policy with the plan;" therefore, Neuma's claim for benefits was not "subject to reasonable debate." R.49 at 10.

We have noted that "[t]he requirement of a colorable claim is not a stringent one." Panaras, 74 F.3d at 790. A plaintiff achieves status as a beneficiary if they have even an "arguable" claim; "[o]nly if the language of the plan is so clear that any claim as an assignee must be frivolous is jurisdiction lacking." Kennedy, 924 F.2d at 700; see also Panaras, 74 F.3d at 790. Even in cases where a plaintiff's claim ultimately failed, the "possibility" of success was sufficient to establish participant or beneficiary status. Kennedy, 924 F.2d at 701; see also Jackson v. E.J. Brach Corp., 176 F.3d 971, 979 (7th Cir. 1999); Riordan, 128 F.3d at 552; Panaras, 74 F.3d at 790. A determination regarding the relative strength of that claim has often been deemed to go to the merits, not to whether standing as a participant or beneficiary was demonstrated. See Riordan, 128 F.3d at 552; Kennedy, 924

F.2d at 701./11

With this minimal standard in mind, we must respectfully disagree with the district court's conclusion that Neuma's claim was not colorable under ERISA. The parties do not dispute that Larsen properly assigned his right to benefits to Neuma, and Neuma claimed that the language of the plan documents required AMP to continue to pay Larsen's life insurance premiums. This legal argument "is 'not so bizarre or so out of line with existing precedent'" that Neuma has failed to meet "'the low threshold of the colorable requirement.'" Panaras, 74 F.3d at 790 (quoting Andre v. Salem Technical Servs., 797 F. Supp. 1416, 1421 (N.D. Ill. 1992)) (internal quotation marks omitted). After reviewing the merits of Neuma's claim, we have found that the language of the Summary Plan Description does not afford Neuma the relief it seeks. However, the claim had at least an arguable chance of success, and we do not believe that in hindsight it should be deemed so obviously lacking in any legal merit as to be characterized as frivolous.

Accordingly, we reverse the district court's decision on this issue. In doing so, we note that a determination as to whether penalties should be awarded under Section 502(c) is a matter left to the discretion of the district court, see 29 U.S.C. sec. 1132(c)(1), and we express no opinion as to whether any penalty would be appropriate in this case.

D. Negligent Misrepresentation Claim

Count II of Neuma's complaint is styled as a state law, negligent misrepresentation claim against AMP. It notes that, before Neuma purchased the rights to Larsen's group life insurance benefits, it requested information from AMP regarding the contours of those benefits. A few days after receiving that information, Neuma purchased the rights in question. Now, in Count II, Neuma alleges that the information provided by AMP "omitted material facts and contained false statements of material facts concerning the operation of the Plan as applied to Larsen." R.38 at 5-6. Neuma claims that, in its response, AMP negligently (1) stated incorrectly the amount of Larsen's life insurance

coverage; (2) provided incorrect information regarding how the amount of that insurance could decrease in the future and (3) omitted important information about the extent to which conversion to an individual policy of insurance was available, in the event that AMP terminated Larsen's coverage. More generally, Neuma claims that it suffered damages by paying "valuable consideration" for an amount of life insurance benefits that AMP now claims "are not provided under the terms of the Plan." Id. at 6. Among other relief, Neuma sought compensatory damages in the amount of $81,600, the full amount of the life insurance benefits for which Larsen enrolled while working at AMP.

Having dismissed the federal ERISA claims in the suit, the district court declined to exercise supplemental jurisdiction and dismissed Count II without prejudice, so that it could be filed in state court. Neuma submits that the district court chose the wrong course because it had diversity jurisdiction over this claim and should have retained the claim on that basis. AMP counters by arguing that diversity jurisdiction does not exist because the amount in controversy is below the statutory threshold. AMP comes to this result by arguing first that the allegations in Count II that involve the administration of the benefit plan and monies due under that plan are completely preempted by ERISA. It then claims that dismissal of this count was proper because "when stripped of the allegations relating to administration of the Plan, and monies purportedly due under the Plan, [Count II] does not allege diversity jurisdiction." Appellee's Br. at 19. AMP maintains that "the only non-Plan damages would be the consideration which Neuma paid for the assignment" and because "this amount was not alleged, diversity jurisdiction was not satisfied." Id.

We cannot accept AMP's argument that the allegations in Count II are completely preempted by ERISA. The complete preemption doctrine is an exception to the well-pleaded complaint rule, which normally allows that "'the plaintiff is master of the complaint . . . and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court.'" Speciale v.

Seybold, 147 F.3d 612, 614 (7th Cir. 1998) (quoting Caterpillar, Inc. v. Williams, 482 U.S. 386, 398-99 (1987)). "This jurisdictional doctrine provides that 'to the extent that Congress has displaced a plaintiff's state law claim, that intent informs the well-pleaded complaint rule, and a plaintiff's attempt to utilize the displaced state law is properly recharacterized as a complaint arising under federal law.'" Jass v. Prudential Health Care Plan, Inc., 88 F.3d 1482, 1487 (7th Cir. 1996) (quoting Rice v. Panchal, 65 F.3d 637, 640 n.2 (7th Cir. 1995)). The Supreme Court has held that the civil enforcement provision of ERISA, Section 502(a), completely preempts state law causes of action that fall within the scope of that provision. See Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 67 (1987); see also Speciale, 147 F.3d at 615. Our cases have identified three factors to be used in determining whether a plaintiff's state law claim is properly characterized as a suit under ERISA's Section 502(a): "(1) whether the plaintiff is eligible to bring a claim under that section, (2) whether the plaintiff's cause of action falls within the scope of an ERISA provision that the plaintiff can enforce via sec. 502(a), and (3) whether the plaintiff's state law claim cannot be resolved without an interpretation of the contract governed by federal law." Jass, 88 F.3d at 1487 (internal citations and quotation marks omitted).

Neuma's claim in Count II is that AMP, as the plan administrator, misrepresented the terms and conditions of Larsen's life insurance program, causing Neuma to purchase the rights to a policy that was far less valuable than it was led to believe. The closest analogue to an ERISA cause of action would appear to be a claim for breach of a fiduciary duty by AMP in negligently misrepresenting the terms of the plan./12 However, when Neuma requested this information, prior to its purchase of Larsen's right to benefits, it was not a participant or beneficiary to whom AMP would have owed a fiduciary duty. See 29 U.S.C. sec. 1104 (stating that, under ERISA, a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries"); see also Uselton v. Commercial Lovelace Motor Freight, Inc., 940 F.2d 564, 582-83 (10th

Cir. 1991). In light of the fact that Neuma's claim in Count II does not fall within the scope of an ERISA provision that it can enforce via Section 502(a), we do not believe that the claim is completely preempted by ERISA./13

In order to support diversity jurisdiction under 28 U.S.C. sec. 1332, two basic requirements must be satisfied: (1) complete diversity of citizenship between the plaintiffs and the defendants and (2) the proper amount in controversy (more than $75,000). See Del Vecchio v. Conseco, Inc., 230 F.3d 974, 977 (7th Cir. 2000). There is no dispute that diversity of citizenship exists in this case./14 Moreover, aside from its argument regarding complete preemption, AMP does not otherwise challenge Neuma's allegations with respect to the proper jurisdictional amount at stake. To satisfy diversity jurisdiction, Neuma must demonstrate no more than a good faith, minimally reasonable belief that its claim will result in a judgment in excess of $75,000. See St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288-89 (1938); Herremans v. Carrera Designs, Inc., 157 F.3d 1118, 1121 (7th Cir. 1998). Neuma has claimed damages of at least $81,600, the amount that it asserts was due under Larsen's policy based on the representations made by AMP. At this stage in the proceedings, we cannot say to a legal certainty that Neuma's claim is for less then the statutorily required amount. See Lindland v. United States of Am. Wrestling Ass'n, Inc., 230 F.3d 1036, 1038 (7th Cir. 2000) (citing St. Paul, 303 U.S. at 289).

Conclusion

For the reasons set forth in this opinion, we affirm the district court's judgment denying Neuma's claim for benefits under Section 502(a)(1)(B). We reverse the district court's decision denying Neuma's claim for penalties under Section 502(c) and remand that claim to the court for further proceedings consistent with this opinion. Lastly, we reverse the district court's dismissal of the negligent misrepresentation claim and remand that claim to the district court for further proceedings. The parties shall bear their own costs in this court.

AFFIRMED in part, REVERSED in part,

and REMANDED

FOOTNOTES

/1 Neuma also named Provident Life and Accident
Insurance Company ("Provident"), the company that
provided the life insurance policy in which
Larsen had enrolled, as a co-defendant. However,
Provident reached a settlement agreement with
Neuma and, consequently, was dismissed from the
case.

/2 Count III of the complaint involved a claim that
AMP breached its fiduciary duty in discharging
its duties as plan administrator and plan sponsor
under 29 U.S.C. sec. 1104(a)(1) of ERISA. The
district court ruled in favor of AMP on this
claim and Neuma does not challenge that ruling on
appeal.

/3 Before the district court, Neuma also argued that
regardless of whether the "Plan" in the Disabili-
ty Clause ended, a "Reservation of Rights" clause
in the Summary Plan Description precluded AMP
from terminating the life insurance benefits of
disabled employees like Larsen. This clause gave
AMP the right to terminate the plan at any time,
and notes that "[a]ny such change or termination
in benefits . . . may apply to active employees,
future retirees and current retirees as either
separate groups or as one group." R.42, Ex.6 at
9. Neuma argued that this provision allowed AMP
to terminate the benefits of those listed groups
of employees, but not disabled former employees
like Larsen. The court disagreed, noting that
this reading would conflict with the wording of
the Disability Clause, which required AMP to pay
disabled employees' premiums only until the "life
insurance provisions of the Plan terminate." Id.
at 19. In its appellate brief, Neuma maintains
that the "Reservation of Rights" clause does not
give AMP the right to discontinue the coverage of
a disabled employee such as Larsen, but it also
agrees with the district court that Neuma's
rights turn on an interpretation of the Disabili-
ty Clause. Neuma notes that the district court
properly held that the Disability Clause, not the
"Reservation of Rights" clause, sets forth AMP's
right to terminate life insurance benefits of
disabled employees.

/4 In this claim to recover benefits under Section
502(a)(1)(B), Neuma seeks recovery only from AMP
and not from the plan itself. We continually have
noted that "'ERISA permits suits to recover
benefits only against the Plan as an entity.'"
Jass v. Prudential Health Care Plan, Inc., 88
F.3d 1482, 1490 (7th Cir. 1996) (quoting Gelardi
v. Pertec Computer Corp., 761 F.2d 1323, 1324
(9th Cir. 1985)); see also 29 U.S.C.

sec. 1132(d)(2); Garratt v. Knowles, 245 F.3d 941, 949 (7th Cir. 2001); Riordan v. Commonwealth Edison Co., 128 F.3d 549, 551 (7th Cir. 1997). We have, however, allowed a suit for benefits to go forward with an employer named as the defendant when the employer was the plan administrator and the employer and the plan were otherwise closely intertwined. See Mein v. Carus Corp., 241 F.3d 581, 585 (7th Cir. 2001); Riordan, 128 F.3d at 551.

This case presents a rather novel factual situation for the application of these principles. In this case, the parties disagree over the identity of the relevant plan; this complication made it more difficult for Neuma to determine which "plan" was the proper entity to sue. Consequently, the record is somewhat unclear as to the exact relationship between AMP and the relevant plan. On one hand, both parties agree that the instrument under which that plan is operated is the Summary Plan Description. AMP is listed as the plan administrator in the Summary Plan Description. It therefore appears that AMP is the ERISA plan administrator, defined as "the person specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. sec. 1002(16)(A)(i). Notably, the Summary Plan Description also lists AMP as the plan's designated agent for service of process. See Mein, 241 F.3d at 585 (holding that designation as an agent for service of process is one factor demonstrating a close connection between the employer and the plan, a situation that permits the naming of the employer as a defendant); Riordan, 128 F.3d at 551 (same). On the other hand, as our disposition regarding Neuma's claim for benefits demonstrates, the Summary Plan Description does clearly refer to a "Plan" synonymous with the Provident Policy, a fact that would make it less understandable for Neuma to confuse AMP as an entity with the relevant plan.

Given the lack of clarity in the record, AMP's decision not to pursue summary judgment on this basis, and our determination that Neuma is not due benefits under the terms of the Summary Plan Description, we do not think that it is appropriate to dismiss this suit on the ground that Neuma has sued the wrong party. Cf. Riordan, 128 F.3d at 551. Moreover, as one potential form of relief in Count I, Neuma also requested that AMP be required to purchase and maintain an insurance policy on Larsen's life. This request permits recharacterization of this claim as one seeking a form of equitable relief to redress a plan violation under ERISA Section 502(a)(3)(B), 29 U.S.C. sec. 1132(a)(3)(B). Cf. Bowerman v. Wal-Mart Stores, 226 F.3d 574, 592 (7th Cir. 2000).

/5 Neuma also points out that, although AMP is listed as the ERISA plan administrator, the document also recites that "[a]ll benefits are administered by Provident Life and Accident Insurance Company." R.42, Ex.6 at 1. Neuma contends that, if Provident "administers" the Policy, then AMP must be the "administrator" of a "Plan" that does not equate to the Policy. However, a reading of the Summary Plan Description makes clear that, under the same "Plan," AMP and Provident would have different responsibilities. As the designated plan administrator, AMP was responsible for providing plan information to participants and beneficiaries and answering questions about the plan, while Provident, as the "Claims Fiduciary," processed all claims for benefits. Id. at 25-28.

/6 The documents appear to show that the HMO policy in 1997 was issued by Kaiser Permanente and in 1998 was issued by Aetna/US Healthcare.

/7 Q: [Neuma's attorney] Now, directing your attention to page 32 of Exhibit 3 [the MetLife summary plan description]?

A: [Mooneyhan] Yes.

Q: It says Employer Identification Number and Plan Number; that in fact is the same Plan number as appears [in the Provident Summary Plan Description], correct?

A: Temporary EI number. That's issued by the federal government. That doesn't change.

Q: That 524 number at the end is a Plan number, isn't it?

A: Right.

Q: And that's specific to the Benefit Plan of AMP, correct?

A: The life--it's the Plan number for the Life Plan.

R.42, Ex.4 at 210-11.

/8 29 U.S.C. sec. 1132(c)(1) provides in relevant part that:

Any administrator . . . (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting

participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

/9 In its complaint, Neuma states that it made a second request for plan documents to which it alleges it was entitled, including the Form 5500s for 1997 and 1998 and documents relating to the MetLife insurance policy, on or before October 1, 1999. Neuma claims that AMP refused to produce these documents and that Neuma was forced to seek a court order to compel their production. Neuma also seeks statutory penalties for AMP's failure to respond to this second information request.

/10 The district court framed this inquiry as whether, on August 6, 1998, the day that Neuma requested plan information from AMP, Neuma had a colorable claim for benefits. We have noted that a plaintiff must have a colorable claim for benefits not only when he requests plan information but also on the date when the party files suit. See Winchester v. Pension Comm. of Michael Reese Health Plan, 942 F.2d 1190, 1193-94 (7th Cir. 1991) (explaining that because the purpose of Section 502(c) is not so much to penalize as to promote ERISA's goal of providing for prompt and fair settlements, a plaintiff who had settled a benefit claim before bringing suit for penalties under Section 502(c) did not have a colorable claim to benefits under ERISA's meaning); see also Leo v. Laidlaw, Inc., 38 F. Supp.2d 675, 679 (N.D. Ill. 1999). However, Neuma filed its first complaint on October 20, 1998, not long after its request for plan information, and there is no indication that this discrepancy would have had any effect on the outcome of the district court's determination.

/11 For the claim to be one for "vested benefits," Neuma must have a "colorable claim to benefits which the employer promised to provide pursuant to the employment relationship and which a non-frivolous argument suggests have accrued to the employee's benefit." Panaras v. Liquid Carbonic Indus. Corp., 74 F.3d 786, 791 (7th Cir. 1996).

/12 Indeed, in its ERISA breach of fiduciary duty claim in Count III of the complaint, since dismissed by the district court, Neuma alleged that such a breach occurred due to the misrepresentations discussed in Count II.

/13 AMP makes no argument that Neuma's claim is subject to conflict preemption, see 29 U.S.C.

sec. 1144, because, unlike complete preemption, conflict preemption arises as a federal defense to a state law claim. For purposes of determining federal jurisdiction, a court does not rely on the availability of such a defense, but must instead look to the allegations made in the complaint. Cf. Speciale v. Seybold, 147 F.3d 612, 614-17 (7th Cir. 1998).

/14 Neuma is an Illinois corporation with its principal place of business in Illinois, AMP is a Pennsylvania corporation with its principal place of business in Pennsylvania and Provident is a Tennessee corporation with its principal place of business in Tennessee.